You may be seated. This is our first case of the morning. 4-10-0-1-1-1, Eller v. Villegas. For the appellant, is it Muller? Muller. Muller. For the appellant, Mr. Muller, and for the appellant, Mr. Waller. You may proceed. May it please the court, counsel. My name is Alan Muller, and I'm here representing the plaintiff and the appellant, Penny Eller. I want to take the court directly into the two issues that I think are dispositive of this case, which are the issue of judicial admissions, whether the testimony of the doctor, defendant, Dr. Villegas constituted judicial admissions, and if so, what the legal ramifications of that are. And secondly, on the issue of the special interrogatories that we had offered at trial, that the trial court decided not to give, which we believe should have been given, and under, as I'll discuss later, under the focus of the procedure, I think requires, assuming the special interrogatories are in their proper format, requires that the case be sent back down for retrial. Let's talk about the judicial admissions, because I think if the court agrees with this, that the judicial admissions here did give away, from the defendant's perspective, the issues of liability and practice of policy, and we don't need to address the special interrogatories. The cases that were set forth in the parties' briefs regarding what is required for a showing, that statements made by a party are judicial admissions, or what the inquiry for the court should be, and I want to go through those and examine what Dr. Villegas testified to, and whether that meets with the criteria elements that need to be shown in order for statements to be considered to be judicial admissions. First of all, I do want to talk about standard of review for judicial admissions. Under the Elliott v. Industrial Commission case, which was cited in our brief, it's actually a first district case, it's a workers' comp panel, actually your colleague Justice McCullough penned the decision, discusses the fact that whether a testimony of the party, a judicial admission is unequivocal, is a question of law for the court to decide, because I think that's what we're dealing with here. I think this is a de novo standard of review. But let me go through the issues. The elements, the cases I'll say, of judicial admission are it has to be deliberate, clear, and unequivocal. On the question of deliberate, what the court is talking about is whether the remarks made or the testimony given might be, whether the party intended to make those remarks or whether they were in the form of an aside or some inadvertent remarks. So, for example, in the Fritsch case, there was a comment made by an attorney during the direct examination of his client. It was kind of an aside, wasn't central to what was being discussed at the time. Later it was suggested that he had made a judicial admission that bound his party, and clearly comments of conflict blinded his client. But in this case, the court said, no, that's an inadvertent comment. But here we have a doctor testifying in a court proceeding, being an adverse exam. He's being asked, would it be a violation of standard of care for a medical receptionist to override a doctor's orders? What's unclear about that? What's unclear? The doctor had time to consider the question. There's no equivocation. There's nothing unclear. In fact, in answer to the question as initially posed, the doctor restated the question. I give you the site to the record, but it's in there. The doctor said, violation of standard of care, override orders. Yes, I agree with that. That would be a violation of standard of care. The doctor, therefore, in restating the question, was clarifying it in his own mind before answering it. So it's a deliberate response. He's thinking about it. It's not an aside in a different context. He's saying, yes, it would be a violation of standard of care for a medical receptionist to override my orders. Second question immediately following that, would it be a violation of standard of care for a medical receptionist to evaluate chest pain? Without equivocation, without hesitation, the doctor answers very plainly, very simply, yes. Mr. Muller, who would answer those two questions any differently than the doctor did? No one. And taken out of context, without any other testimony in the record, sure. If I, as a lawyer, my staff does something that's wrong, I'm responsible for it. There's no question about that. But here we have testimony elsewhere in the doctor's adverse examination that, number one, if these tests did not get performed as he had ordered them, that he would be responsible for that. And we have testimony that, in fact, the tests did not get performed. So there's your link. It's not sure it's in there. That question alone, all it establishes is, yes, conduct like that would be a violation of standard of care. So we have to look to the other testimony to say, okay, where is it in the record that this actually occurred, such that that violation of standard of care occurred in this case? And the doctor gives us that. He also says on the evaluation of the chest pain that Nicole made a medical judgment. And, again, he can't let that happen. So taken as a whole, that test... He actually said she and the patient made a medical judgment together, I think. Well, and then later he says he would be responsible if she... She was making a medical judgment. Yes, originally he said that was a medical judgment. Well, she and the patient made it. Later he says, quite unequivocally, and I can find the quote for you if you want, but says, yes, I'm responsible if she shouldn't be evaluating chest pain. And whether the patient... But didn't he also testify, Mr. Miller, that at the end of the day she did tell him that the patient was scheduled for later instead of the next day and he didn't quarrel with that? That's correct. The doctor did suggest that later in the day she told him that she had changed it for several weeks down the road. And the claim is that that information or that conversation took place on the same day. However, the doctor does not at any point repudiate the fact that that violation of the standard of care occurred, nor does he repudiate the fact that that violation of standard of care, the rescheduling, did not lead to the events that occurred which caused Terri Eller's death. In other words, he agrees that she shouldn't be evaluating chest pain, and I can't be allowing that to happen. She can't be overriding my orders. In the later questioning, the doctor is asked, well, if the test had been done as you ordered it, you know, where I'm jumping ahead through several questions because there were two or three series of questions to get to this answer. But if the test had been done as ordered, would Terri Eller have, you know, luckily enough it would not have been fatal if he'd gotten the test as ordered the next morning and therefore had been sent on for a cardiology consult in Springfield. The doctor answered yes. That's where we get the proximate cause. We're not just establishing the first three questions in this exchange, establish what the standard of care violation would be. The facts of the case are clear. She overrode his orders. She evaluated chest pain. How bad is her chest pain? Not bad. Well, is that something a layperson in an office, you know, is capable of evaluating? Why is it clear that Skinner overrode the doctor's order if the doctor, after seeing the scheduling of the treadmill had been changed, said that's okay? I don't see that as being clear that she overrode the doctor's order. Well, she in her testimony said that the chart when she got it, well, it was unclear because in the deposition she said one thing and her testimony another. But she said the order was in the chart for the treadmill the next morning. The patient wanted to postpone it. Rather than asking the doctor about whether it's okay to postpone it, why he ordered it for the next morning, she asked the patient about the chest pain. Later in the day, as you say, the doctor offers that she told me about it. I said, oh, that's okay. It wasn't an emergency situation. However, again, the doctor still, in that moment of saying, you know, if we believe him, and I'm not here to argue whether we do or don't, I think you have to in this instance, take what he says at its face value. If he had at that point said, gone back and said this overriding of my order, the rescheduling of this order without my knowledge, that's okay. You know, it's not a big deal. And her doing that was not a violation of the standard of care, then, yeah, I think that's, in repudiating that, that's fine. It's not, we don't have the liability for the professional negligence in her overriding his order. I'm not sure if that answers your question directly. I'm kind of talking around it. I apologize for that. But the second part of it, though, in evaluating chest pain, she says the reason she orders it for two weeks on the road is because she asks him about chest pain. All of this is interesting, and in a vacuum doesn't mean much, because the doctor later says, oh, it's okay. You know, I ordered it for the next morning, and goes through with questions with Mr. Bland, asking him, explaining why he ordered it for the next morning. Because he was at risk for a serious cardiac event, even a fatal cardiac event. He goes through all these questions with the doctor, saying, yeah, chest pain is a various thing. Some chest pain can be indicative of an urgent, you know, medical emergency. Others not. It's not for a layperson to be evaluating this. And based on all the factors, when I saw Terry Eller on July 1st, I felt he needed the test the next morning. Now, again, he later says, well, it's okay. You know, after the fact, okay, maybe he did need it the next morning. But, again, at the time, he says he ordered it because it was needed. He also says it wasn't done, and because it wasn't done, Terry Eller didn't get the life-saving care he would have gotten by virtue of a referral up to Springfield for a cardiology. Well, what if he sees the patient on Monday and says, scheduling for the next available stress or next available treadmill? And the next available treadmill, they're booked on Wednesday, so the next available treadmill is Friday. And when he goes to the receptionist, the receptionist says, we're booked for Wednesday. How about Friday? And the patient says, okay. But we end up with the same result. Well, except now, does the doctor in your hypothetical judge, does the doctor, you know, okay, does the receptionist ask the doctor, is it okay, does this need to be done on Wednesday, or can we go ahead and schedule it for later? And, you know, the other point being that the doctor here in his other testimony admits that the treadmill would have been life-saving, that if he had gotten the treadmill the next morning, he would have, more likely than not, would have been positive. He would have sent him up to Springfield to see a cardiologist. They would have taken him to the cath lab. They would have found the blockage that they found at autopsy, and Terry Eller would be alive today. So, you know, the doctor is saying, well, you know, I okayed it, and therefore it's not a violation of the standard of care. He didn't say that. But you accept and believe, and I suppose would even be complimentary that he's candid enough to say, if he had it the next day, we're all okay. But you don't want to believe, and I think you said, you know, we have to accept what he said, that he's saying, essentially, I didn't think that it was an emergency and that it needed to be immediately. Just it needed to be soon, or perhaps sooner, but it could have been a day later, two days later, three days later, five days later. That would depend on scheduling. And then when asked about it, it says he wasn't in distress, and he describes how he viewed Mr. Eller, and he doesn't say, and I don't know if he was asked, did you think he absolutely, you know, he just had to have that the next day, or the same day. Or were you comfortable, based upon his condition, and not mattering whether it was rescheduled. All of this goes towards saying, isn't it less than unequivocal? In fact, isn't, in context, this at least somewhat equivocal, which takes it out of the realm of being a judicial admission? Well, I think the first three questions are unequivocal. The approximate cause one, I think, is the one you're questioning. It's whether that's equivocal or unequivocal. Well, no, that's, I mean, we, and you like, I mean, his candor. I mean, he says, yeah, it should have happened the next day. Well, what he's saying is, I believed it was serious enough to order it for the next day. Does he say, I felt this was so emergent that he had to have it done right then? Well, he felt it was emergent enough that he did an EMG in the office that showed a, you know, and what the significance of it is, there's testimony about later, but we don't need to get into that issue. He thought it was serious enough that he needed a treadmill and ordered it for the next day. Whether he thought it could have been delayed, we don't know, you know, still his after-the-fact testimony, ratification of what his nurse does. But, you know, he felt it was serious enough, obviously, because he ordered the treadmill and had it done the next day. Now, they happen to be doing it the next day, that's great. That may be mere coincidental, but actually in the questioning by Mr. Bland, the doctor says, you know, a person with these risk factors, a person with this presentation is at risk of an acute event. And that's why you ordered the test the next morning, isn't it? Yes, treadmill the next morning. That's an answer to the question. So I think in those questions, he is indicating a belief that this is emergent enough of a situation that we don't want to delay it. Now, again, after the fact, after staff changes his orders without questioning, you know, asking the doctor whether it was okay, based on the staff's evaluation of the patient's chest pain, you know, then he says, oh, that's okay. But, again, he's already said staff changing my orders is a violation, or overriding my orders is a violation of standard of care. If my orders had been followed through as implemented, Terry Eller would be alive, and that's where I believe the proximate cause comes in. I don't want to belabor the point on whether it's equivocal or not. Well, were there questions asked about whether or not he viewed what the receptionist had done was overriding his orders in medical judgment? Or is this phrasing, I mean, I know doctors that don't know what day of the week it is. They don't know when the tests are performed and they're off. I mean, they'll schedule for you for the test out at the counter, you know, or my nurse will take care of that. He doesn't know whether it's Monday or Friday. The doctor wrote it in his chart, treadmill and AM. That's clear. Treadmill and AM. Yes. And he also says that, and I can pull out for you exactly where he was asked what Nichols did in changing the orders. You'd order it in the morning and she changed your order. I mean, you can call it what you want, whether it's overriding the doctor's orders or not. She changed the order. The doctor has it scheduled for morning. It would be akin to me telling a client calls in with a personal injury case and I become concerned that statute of limitations may run in the next week, and I tell my secretary, well, get them in tomorrow because I need to find out when the heck this happened. And my secretary calls the person back and says, well, he wants to see you in the morning. The person says, I can't get in in the morning. I say, well, when was your accident again? They say, well, I'm not sure exactly. And so she says, well, okay, we'll schedule it for two weeks down the road. It's the same thing. And I'm responsible for that because I didn't, my staff didn't follow through on the orders that I set up. And now if I say after the fact, well, it was a bad case anyway, you know, and if this person had come in that clueless about when his accident happened, I probably wouldn't have been able to figure it out within the three days I had left to file it before the statute ran. Well, wouldn't your hypothetical have to include based upon the facts here is that your secretary, after she scheduled the appointment three weeks down the road, came into your office and says, oh, by the way, I actually scheduled this appointment two or three weeks down the road, and you still have that statute of limitations question in your head. But you said, okay, that'll work. And then under your hypo, your secretary didn't really override your order. You kind of adopted what she did as far as scheduling. Actually, I disagree to the extent that, yes, she did override my order, which was specific, scheduled this for tomorrow. Whether I later say, well, that's okay. Now, would I say that? No, but under these circumstances, no. I hope I wouldn't do that. I'm a little more nervous about those things. But anyway, let me jump ahead. I don't want to ignore the concerns the court has on this, but I did want to touch briefly on the limited time I have left on the special interrogatories. And as the court knows, the code specifically requires that special interrogatories be given when they're in the proper form. And here we've asked, had proposed a very simple special interrogatory. Did Dr. Villegas fail to do something in caring for Terry Eller on July 1st, 2003, the reasonably careful physician? Practicing under similar circumstances would have done it. If you compare that with 105.01 in the Illinois Pattern of Instructions, it's the definition of professional negligence, you'll see that the language of our proposed special interrogatory is directly drawn from 105.01, which says, amongst other things, professional negligence is the failure to do something that a reasonably careful physician would have done, or the doing of something that a reasonably careful physician would not do under similar circumstances. Point being, our special interrogatory, all the cases talk about the purpose of them is to sharpen and clarify the jury's consideration of the case and the issues in it. Here in the special interrogatory, we're taking language directly from 105.01, but we're directing the jury's attention not to, well, something the doctor did that he shouldn't have done, or something he didn't do that he should have done. We're focusing him in on his inaction. Did he fail to do something on this date? Not in general professional negligence as this. We're saying, did Dr. Villegas fail to do something that a reasonably careful physician would have done in his actions on this date? As such, I don't think the defense argues that that's unclear in some fashion. It's misleading. It's cumulative. It's not. I don't know how we could be much clearer. We're focusing him in, taking that longer patterned instruction, directing him to the specifics of this case. If you agree that this form is appropriate and that it helps to serve to clarify and sharpen the jury's consideration of the questions presented by the case, and under the rules, it has to be given. It's not discretionary with the court to give it as long as it's in its proper form. We'll hear more from you on rebuttal, and you can continue with that on rebuttal. Okay. My time up? Yes. Oh, okay. Red light. May I please record Mr. Muller? My name is Robert Muller. I represent the defendants, Dr. Villegas and Dr. Villegas, SC. With regard to the question of judicial admissions, which occupied much of Mr. Muller's discussion with you, the first thing I would say is, every time you go to a seminar, everybody says, make sure you stress standard of review. Appellant takes the position that standard of review is de novo and cites the Elliott case. We have cited two cases where judicial review, I'm sorry, judicial admissions, whether there's been a judicial admission made or not, would be an abuse of discretion standard. There's Smith and Pavlovic and Remko versus Hartz, the first two cases in our brief. Having said that, that's what they always tell you that is important. I have to honestly say, sometimes I wonder, but nonetheless there is a dispute about what the standard of review is. I believe that under either standard, and that's why I say sometimes I wonder and does it make a difference, I believe that under either standard there's absolutely no question that Dr. Villegas did not make any judicial admissions on the stand or that his entire testimony did not constitute a judicial admission. I think that there are many holes in the long series of questions that appellants point to, that plaintiffs point to as a judicial admission, but to me the easiest to understand comes down to, and this is by no means abandoning the rest, because I think each of you asked questions that, as I say, exposed what I think are problems in their interpretation of this as a judicial admission, but the easiest one to me to understand is when you get to causation, then the question, if there's a question of causation, there could be a judicial admission of liability, but that's not what they're shooting for, they want a judicial admission to conclude liability entirely. On causation, the question in the case boiled down to, in my opinion, from the very first time I visited the facts of this case, is who actually did reschedule this appointment. Did Nicole Leitchu, Ms. Leitchu, reschedule it, or did she acquiesce in the rescheduling of it by Mr. Terriella? And there was sufficient evidence for that jury to look at on both sides of that question, and arguments that were addressed to that, that constitute a dispute for the jury to weigh that question. Who is it, in fact, who rescheduled this appointment? If, in fact, it was Mr. Terriella who rescheduled this appointment, then all of the statements that Dr. Villegas made on the stand are, and they're true, I mean, you know, how else could he answer these questions? Is it okay for your non-nurse staff, or even your nurse staff, to make medical decisions? Is it okay for them to overrule your orders? Why, of course not. It's not okay for my secretary to overrule my orders as a lawyer. But the question is, in this particular case, by analogy, who rescheduled, my secretary or the client? I mean, Mr. Eller, under the inferences in this case, is the one who I believe did reschedule. Now, that's not the only problem. There is another causation problem, which I also want to focus on, and that is this question of, we have two questions. Should this staff member be able to overrule your orders? Basically, let's just deal with that one, because they're both the same. Should this person be able to overrule your orders? And the answer is, of course, no. But the question then was never posed to the doctor, did the standard of care require that Mr. Eller have that test in the morning? No. The question was, wouldn't it have been, essentially, wouldn't it have been better if he'd had the test in the morning? Well, by retrospect, of course, it would have been better. But this is simply a but-for causation argument. In other words, is the doctor's opinion that the test should be done as soon as possible, because that's kind of like the best thing you can possibly do, but when asked the direct question, well, when did they need to be done, within your opinion? Not only did he answer that question in terms of, like, several weeks to a month would be okay. He answered that question for practical purposes, when Ms. Leitchuk came to him and said afterwards, look, he didn't want to do it tomorrow. He wanted to do it later. And the doctor said, that's okay. Because he did understand that it was not the standard of care to require that those tests be done. He obviously has to answer the question that was posed to him, wouldn't it have been better, wouldn't it be good? And, in fact, then you go to the but-for. And, in fact, if they were done, now what's the concept? Well, then the gentleman probably wouldn't have had a heart attack and died. Well, that's true, but that's but-for. At the time he took the actions, at the time both actions were taken, the question is, did the standard of care require it? And that question was never asked. That question was never addressed in the line of question. The question of, was this gentleman at risk? I'm at risk. You know, the doctor admits that some of the things that the patient presented with put him at risk for heart disease. Just because we're at risk for heart disease does not require that certain things then be done immediately. You have to have a certain set of circumstances in order to require those things to be done immediately. And nowhere was the doctor asked whether this actual set of circumstances required that the gentleman have the test the next morning. All that he was asked was, didn't he order it the next morning? And he did. And it would have been done the next morning had all things followed. But there was nothing asked of him, is that the standard of care? So there are at least two areas. Number one, there was no admission that the standard of care required it. As you go through there, you cannot find a clear, unequivocal statement that the standard of care required that the test be done immediately. And two, we have the causation question, which I frame in one way with but for, but I also clearly frame it in terms of there was factual dispute, factual controversy for the jury to address as to whether it was in fact Ms. Nicole Leitschuh who rescheduled this exam or whether it was in fact Mr. Eller. And of course, I don't see how you can get past that causation problem. With regard to the special interrogatories, I would say to the court that the problem with the special interrogatories from plaintiffs, first of all, I think the standard of review with regard to special interrogatories is abuse of discretion. And we had cited cases to the court on that point. But I think that the question becomes with regard to the special interrogatories, the most important case for this court's understanding of the trial court's ruling is the Northern Trust case we cite to the court. Basically, there were two special interrogatories that were addressed to the court, offered and tendered in that particular case. And neither was case dispositive of the issues in the case. And that court, citing as well the Hollis v. Terminal Railroad Association case, that this is the Northern Trust v. University Hospital, University of Chicago Hospital's case, that case held that you can't piggyback two special interrogatories. Now, I recognize that the code uses the word interrogatories, and there's nothing wrong with anybody trying to offer two special interrogatories. But the problem becomes trying to interlock two special interrogatories where you piggyback one onto the other. And that was the reason that those were properly rejected, both in the Northern Trust case and the Hollis case, because in neither situation was each special interrogatory standing alone, case dispositive, in favor of the person who was tendering the instruction. They had to work together in tandem. Now, the second problem with these two, when you talk about working in tandem, is that they use language, not inconsistent language, that is, not language that's inconsistent for lawyers, but language which is difficult for a jury to figure out, in that they use different descriptors for the wrongful conduct. I think the one is professional negligence, and the other is deviation from the standard of care. And I think that, if I may, I will go to those and tell the court that the first was fail to do something in caring for Mr. Eller, and the second was whether professional negligence was approximate cause. Now, the problem with those is that a jury has to be able to communicate those two concepts back and forth. And I believe that that was part of the reason that the trial court probably felt that they were confusing. But, as I say, most importantly, I consider the situation, the fact that the Northern Trust case says you can't have interlocking ones, you can't have two separate ones which you try to form together to make the case dispositive. Neither was alone case dispositive. I'm not sure if the court doesn't have any questions for me. Did I have anything further? I mean, I could certainly just kind of rehash my brief and everything. But, I mean, you know, if somebody has a question for me, I'd be glad to answer it. I don't believe we have any questions. Thank you. Mr. Muller? In the place of court and counsel, a couple of things. First of all, I think that the special inrogatories case that you need to be concerned with is the Snyder case, which is a Fourth District case, penned by your colleague Justice Stegman, which talks about special inrogatories need to be a single question, relate to an ultimate issue of material fact in terms of simple and ambiguous, understandable. The Northern Trust case, I think, by counsel actually involved two sets of special inrogatories. One set was two questions which allowed the doctors in that case to get out of the case, which the court didn't have any problem with. Then there were three questions posing three different theories of negligence by the hospital, and the court said no, one answer in one of them wouldn't be dispositive of the other two, so therefore you can't group the three together. Well, what about the first special inrogatory? Isn't it possible that you could answer that by saying yes, but it wasn't something that was part of the complaint or wasn't something that relates to the heart condition? Oh, it was part of the complaint, Your Honor. One of our allegations in the complaint, I think. I mean, could the jury have concluded that the doctor failed to do something that they would have liked for a doctor to do? And then the second question. And the answer to that is yes, but they're not talking about the failure to communicate with his receptionist or not ordering the test. They're talking about he didn't ask additional questions about the connection between circulation and the guy's foot problem. I mean, it's nonspecific. In the general instructions, the jury is asked much the same thing. They're asked professional negligence is failure to do something. When they return a verdict, a Form B defense verdict, we don't know what they decided the doctor didn't, or if they were to find for the plaintiff under the jury, the doctor didn't do something under that general instruction. We don't know what it is that they found he didn't do, but they find that he was negligent, right? I mean, the point being, under the general instructions, we don't know why they come back with a plaintiff's verdict or a defense verdict. How do you know more now with this question? Well, we're focusing them in on something we're alleging in the complaint. In the cases, Schneider case says you have to read the special interrogatory in conjunction with the other instructions as well as the complaint. So, you know, the first question we asked, did he fail to do something a reasonably careful physician would have done? Second question, was the professional negligence of Dr. DeLagos, referring back to the first question, which they just answered yes, was that professional negligence a proximate cause of Terry Eller's death? It's focusing them in on what they need to consider, amongst other things, rather than all this general language in the jury instructions that they may not, you know, they get 20 instructions, they may not understand them, and you're trying to get them focused. Did he not do something here? And what's the testimony in the case that he did do something? Well, he didn't supervise the staff. He didn't get a test the next morning. How do you get around the argument that this is piggybacking? The case, as I say, the Northern Trust case, there were three separate interrogatories on three different theories of liability. One was that the hospital didn't have a delivery room available. Another one was that they should have, you know, had another doctor ready. I mean, there's three different, completely different theories. So the answer on one of them would not have disposed of the other two. And the court said, no, that's not appropriate. Now, this court found, and it's a case, and actually I think both the justices to my right were on the panel, the Curry v. Murphy case. I did cite it in the brief because it kind of comes in and out, and parts of it are Rule 23, parts aren't. But there were two interrogatories, special interrogatories, and that the first one dealt with whether, you know, specifically did Dr. Murphy, who was the defendant in that case, exercise care, and I'm trying to find my notes on exactly what the case said. But there were two questions virtually identical. Did Dr. Murphy possess and apply the knowledge and use the skill and care ordinarily used by a reasonably well-qualified physician practicing under similar circumstances? Question two, only if you answer no to question number one, then the question asks, was the professional negligence of Dr. Murphy a proximate cause of the death of Merle Bray? Those are basically the identical instructions that we have here. Now, in that case, the defense offered these instructions. They lost, so they weren't being challenged. However, the court considered them on another issue. There wasn't any suggestion by anybody that these were inappropriate. There are a lot of cases, the University of Chicago case, the Northern Trust, the ones that went through the jury found for the defendant doctors, again, they were two questions, first one negligence, second one proximate cause. The Snyder case talks about a single question, but we're trying to avoid those compound questions like, well, do you find that the defendant was negligent and that his negligence was a proximate cause? That gets confusing for a jury. It's like compound questions. We try to avoid them. So we break it up. There are some cases which allow instructions like that, but Snyder suggests you need a single question, not a single interrogatory, but a single question that focuses a jury in. What we've got is one that's almost identical to, but distinct enough from the general jury instructions that it's not duplicative, it's not cumulative, it's not misleading. It focuses a man on what conduct we're talking about, which again, referring back to our complaint, talks about the failures of the doctor to do things that we allege constituted as negligence. And there's testimony on both sides on that, not just regarding his admissions. There's other testimony from the doctors on whether he should have, you know, ordered an immediate cardiac consult without doing the treadmill and done all these other things. But again, with that we're talking, you know, arguing facts that aren't before you, but if we'd gotten the special interrogatory, you know, and the counsel argued about whether it's possible the jury found that Terry Eller was, he was the reason this test was rescheduled. It would have been a perfect opportunity for a special interrogatory, was the conduct of Terry Eller the sole proximate cause of, you know, his failure to get the test and or his ultimate demise. It wasn't given, so it's sheer speculation to say that that's what the jury was thinking when they entered their general defense verdict. Thank you, counsel. Thank you.